**VIGILANT INSURANCE COMPANY,**
**Plaintiff**

v.

**Walter E. BURNELL and Web Electrical, Inc. d/b/a Web Electric, Inc., Defendants.**

**Civ. No. 93–276–P–C.**

United States District Court,
D. Maine.

Dec. 13, 1994.

Benjamin P. Zuckerman, Eileen M. King, Roger A. Putnam, and Roger Clement, Verrill & Dana, Portland, ME, for plaintiff.

U. Charles Remmel II, Kelly, Remmel & Zimmerman, Portland, ME, for defendants.

## DECISION AND ORDER

GENE CARTER, Chief Judge.

This action was commenced by Plaintiff Vigilant Insurance Company ("Vigilant") to collect on a debt allegedly owed by Defendants Walter E. Burnell ("Burnell") and WEB Electrical, Inc. ("WEB") pursuant to a General Indemnity Agreement. The General Indemnity Agreement was executed to obtain surety bonds for electrical construction contracts. The Complaint consists of two counts. Count I is against WEB for breach of the General Indemnity Agreement, and Count II is against Walter E. Burnell, personally, for breach of the same. The parties have stipulated that WEB is liable to Vigilant in the amount of $156,000. A trial was conducted without a jury on Burnell's personal liability.

## I. FACTS

WEB is an electrical contractor whose sole shareholder, and president, is Burnell. P.Ex. 74 ¶ 1. On January 10, 1992, Burnell signed a General Indemnity Agreement [1], both in his personal capacity and his official capacity as president of WEB, in favor of MCA Insurance Company ("MCA") in order to obtain surety bonding for WEB's electrical construction project at Bates College in Lewiston, Maine.[2] P.Ex. 18, 74 ¶ 3. In June 1992 WEB obtained a Subcontract Performance Bond and a Subcontract Labor and Material Payment Bond from MCA which ran in favor of Ouellet, the obligee, as general contractor of the Bates College project.[3] P.Ex. 22, 23, 74 ¶ 5. Under the terms of the

bonds, MCA was bound as a surety in the amount of $447,000. P.Ex. 22, 23, 74 ¶ 6.

In the fall of 1992, MCA suffered severe losses as a result of Hurricane Andrew. Tr. at 103–04. As a result of the losses, the State of Oklahoma Insurance Commissioner began delinquency proceedings against MCA. P.Ex. 66. At that time, MCA, through its vice president and surety operations manager, Soren Laursen ("Laursen"), approached the Chubb Group of Insurance Companies ("Chubb") and requested that Chubb take over MCA's viable surety business. Tr. at 119. The State of Oklahoma Insurance Commissioner, Cathy Weatherford, became MCA's duly appointed representative. Tr. at 119. Acting on behalf of MCA, the Commissioner filed a motion with the district court in Oklahoma County, Oklahoma requesting that Vigilant, a subsidiary of Chubb, "manage" MCA's surety business by "assuming" some of MCA's outstanding bonds. P.Ex. 44.

WEB and Ouellet were notified of the proposed transfer of the bonds from MCA to Vigilant by a letter from Laursen dated December 3, 1992.[4] P.Ex. 29, 74 ¶ 8. The letter also informed Burnell that "the process of having Vigilant replace MCA on each outstanding bond is done by a novation agreement. This requires the signed acceptance of all four parties—MCA as the original surety, Vigilant as its replacement, WEB the Bond Principal, and Ouellet the Obligee." P.Ex. 29. Torelli, who had serviced WEB and Burnell as MCA's agent, continued to service WEB and Burnell, but now as Vigilant's agent. Tr. at 71–72.

At the end of December 1992, Vigilant executed a Novation Agreement whereby Vigilant assumed the obligations of MCA under the WEB bonds for the Bates project.

---

1. The General Indemnity Agreement provides that it shall be governed by New Jersey law. P.Ex. 18 ¶ E.10.

2. In June 1992, WEB entered into a subcontract with Ouellet Associates, Inc. ("Ouellet") to perform electrical contracting services in connection with a new residence project at Bates College. P.Ex. 74 ¶ 4.

3. For purposes of obtaining bonding, WEB and Burnell dealt with MCA's agent, Blair Torelli ("Torelli"). Tr. at 60–70. WEB and Burnell

supplied both corporate and personal financial information to Torelli, who passed that information along to MCA. Tr. at 61.

4. The letter stated, in part:

On November 23 the MCA Bonding team resigned to join Vigilant and carry on the contract surety program under Vigilant's banner. All MCA's surety bond agents became Vigilant agents, and all new bonds are now being written with Vigilant as surety.

P.Ex. 29.

P.Ex. 33. The Novation Agreement did not set forth Vigilant's obligations as surety, but instead incorporated by reference copies of the Bates bonds. P.Ex. 33. Burnell and Michael Ouellet, the owner of Ouellet Associates, signed the Novation Agreement on behalf of WEB and Ouellet, respectively. P.Ex. 33. Burnell signed his name on the Novation Agreement under the typewritten designation "WEB Electric Inc. Principal." The transfer was approved by a Final Order of the Oklahoma State Court entered in January 1993. P.Ex. 74 ¶ 7, Ex. D.

On May 18, 1993, Burnell told Ouellet that WEB was abandoning its work on the electrical subcontract.[5] Tr. at 29. Michael Ouellet attempted to convince Burnell that WEB should return to the project. Tr. at 31–32. At Burnell's urging, Michael Ouellet notified Torelli that WEB had abandoned the project. Tr. at 32–33. Barry Huber, a surety claims adjuster originally for MCA and now for Vigilant, called Burnell and set up a meeting. Tr. at 87. In an attempt to resolve the problem, Huber inquired as to the nature of WEB's problem with the project and specifically whether it was a cash-flow shortage. Tr. at 88. Despite this effort, WEB never returned to the job. Tr. at 88–89. When WEB defaulted on electrical construction contracts, Vigilant paid claims on the surety bonds for labor, materials, and supplies, and for the cost of completion of the electrical construction subcontract. Tr. at 93. Vigilant's total loss was $156,000 as of May 27, 1994. P.Ex. 74 ¶ 14.

## II. DISCUSSION

### A. The Written Documents

The parties have stipulated to WEB's liability under the General Indemnity Agreement. Thus, the only issue remaining is whether Burnell is personally obligated to indemnify Vigilant. Vigilant contends that Burnell is obligated to indemnify it because he agreed in the General Indemnity Agreement to personally indemnify "Surety [at that time MCA] from losses and expenses incurred in connection with any Bonds" issued for the benefit of WEB. P.Ex. 18 ¶ 1, and that through the Novation Agreement it became the surety. Plaintiff's Trial Brief (Docket No. 30) at 6. Burnell asserts that he was released as a result of the substitution of Vigilant. He contends that Vigilant does not conform to any of the definitions of "surety" used in the Novation Agreement. Defendant's Post Trial Brief (Docket No. 29) at 3. The success of Vigilant's argument hinges on the Court finding that the Novation Agreement was a "bond" and that Vigilant was a "surety" within the meaning of the General Indemnity Agreement. The definitions of these words in the General Indemnity Agreement are interdependent.

The General Indemnity Agreement defines "Bond" as "Any and all bonds, undertakings or instruments of guarantee and any renewals or extensions thereof executed by Surety." P.Ex. 18 ¶ A. The Court finds that the Novation Agreement was an "instrument of guarantee" and, thus, within the definition of a bond in the General Indemnity Agreement. Specifically, the Novation Agreement states that "Vigilant shall perform all Obligations of MCA under the Bond, and Vigilant agrees to be bound by all the terms of the Bond in every way as if an original party thereto." P.Ex. 33 ¶ 1. Only the bonds furnished the terms of Vigilant's suretyship obligations, and the bonds are incorporated by reference into the Novation Agreement. By way of the Novation Agreement, Vigilant became bound to pay a second party, Ouellet, upon default by the third party, WEB, in the performance WEB owed to Ouellet under the electrical contract. Moreover, Burnell's liability under the General Indemnity Agreement is not limited to those bonds in existence when he executed the General Indemnity Agreement. Indeed, the Bates bonds came into existence approximately five months after the General

---

5. Defendant's trial brief suggested that WEB was improperly terminated from the Bates College job and that Vigilant was not correct in taking over the job. Defendant's Trial Brief (Docket No. 25). At trial, Burnell testified that Ouellet's failure to pay WEB for the month of April 1993, prevented the company from meeting its payroll. However, Burnell admitted that he failed to present the proper lien waivers to Ouellet and, therefore, by the terms of the contract, Ouellet had no duty to pay WEB for the month of April until the lien waivers were provided. Tr. at 26–29, 154–55.

Indemnity Agreement was executed. Therefore, the Novation Agreement falls within the definition of a bond in the General Indemnity Agreement.

■ The Court also finds that Vigilant falls within the definition of "surety" in the General Indemnity Agreement because it executed a bond, the Novation Agreement, at MCA's request. The definition of "surety" includes persons and companies other than MCA. The General Indemnity Agreement defines surety as "MCA insurance company and any person or company joining with it in executing any Bond, *executing any Bond at its request*, or providing reinsurance to it with respect to any Bond." P.Ex. 33 ¶ A (emphasis added). Because the General Indemnity Agreement was signed by both WEB and Burnell personally, Burnell is personally liable under the still-effective General Indemnity Agreement. The fact that Burnell signed the Novation Agreement in his corporate capacity only is irrelevant to his liability under the still-effective General Indemnity Agreement. Burnell agreed to indemnify the "surety" under the General Indemnity Agreement for losses incurred on "bonds" where only WEB was the principal obligor. The bonds, like the Novation Agreement, were signed by Burnell only in his role as President of WEB.

The General Indemnity Agreement also provides that "Assent by Surety to changes in any Contract or Bond or refusal to so assent shall not release or affect the obligations of Undersigned to Surety." P.Ex. 18 ¶ E(1). MCA assented to a "change" in the bonds by permitting the substitution of sureties. The Novation Agreement did not alter the surety's obligations or its relationship to the principal, WEB, or the obligee, Ouellet. The effect of the Novation Agreement was to substitute Vigilant for MCA as surety under the General Indemnity Agreement and, thus, under the bonds.[6] Notwithstanding MCA's assent to the "change" occasioned by the

substitution of Vigilant as surety under the terms of the Novation Agreement, Burnell remains personally liable.

### B. The Intent of the Parties

■ In an earlier decision in this case, the Court found that the Novation Agreement is not a complete integration of the parties' agreement and that, "in light of the circumstances in which the Novation Agreement was made, the intention of the parties regarding indemnification is ambiguous." *Vigilant Ins. Co. v. Burnell,* 844 F.Supp. 9, 12 (D.Me.1994). Under these circumstances, parol evidence is admissible, not to contradict or alter the terms of the written agreement but to explain the real intent of the parties. *In re Voorhees' Trust,* 93 N.J.Super. 293, 225 A.2d 710 (1967); *Affiliated FM Ins. Co. v. Kushner Companies,* 265 N.J.Super. 454, 627 A.2d 710 (Ct.Law Div.1993); *Speirs v. Spanko,* 7 N.J.Super. 421, 71 A.2d 395 (1950).

> The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded.

*Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 N.J. 293, 96 A.2d 652, 656 (1953). *Accord Jacobs v. Great Pacific Century Corp.,* 104 N.J. 580, 518 A.2d 223, 227 (1986). The Court will also consider conduct of the parties after the Novation Agreement was signed in order to determine the intent of the parties. *Restatement (Second) Contracts* § 202(5) ("the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade"); *Michaels v. Brookchester, Inc.,* 26 N.J. 379, 140 A.2d 199, 204 (1958) ("Where ambiguity ex-

---

6. This conclusion is supported by the fact that WEB stipulated to its liability to Vigilant on the bond. If Vigilant was not substituted for MCA on the bond then WEB would not be liable to Vigilant.

Burnell also contends that the definition of surety should not be construed to cover circum-

stances where MCA is released, because the definition was not constructed with this in mind. Defendant's Post–Trial Brief at 4. But, if Burnell is correct then WEB should not be liable under the Novation Agreement to Vigilant either. However, WEB has stipulated to its liability.

ists, the subsequent conduct of the parties in the performance of the agreement may serve to reveal their original understanding.").

The Court's finding of personal liability on the basis of the written documents themselves is not contradicted by the evidence of the parties' intent. The objective intent of the parties in this case is clear. In the contract surety business the principal obligor and its individual owners almost always execute general indemnity agreements. Tr. at 99–102. WEB and Burnell followed this custom by executing the General Indemnity Agreement at the beginning of the bonding relationship.

The Novation Agreement was executed by the then surety, MCA, in order to substitute Vigilant as surety. The purpose of the Novation Agreement was to continue the bonding provided by MCA and, thus, its execution benefited both Burnell and WEB. Nothing changed from WEB or Burnell's perspective after the Novation Agreement was signed. MCA's employees became Vigilant employees, and Burnell dealt with the same agent throughout. Burnell continued to send his personal, as well as WEB's corporate, financial statements to Vigilant's agent.[7] Tr. at 156. In addition, testimony revealed that Burnell nodded his head approvingly when Huber told him specifically that he would be personally liable for all cost and expense incurred by Vigilant as a result of WEB's abandonment. Tr. at 89–90. If Burnell believed that his obligations under the General Indemnity Agreement had changed or terminated, then he would have protested when Vigilant's representative told Burnell that he was personally liable for the default. Burnell testified at trial that he did not intend to be bound personally to any entity other than MCA. Tr. at 147–48. This statement is clearly contradicted by the language of the General Indemnity Agreement which extends indemnification to entities other than MCA. P.Ex. 18. Therefore, the Court finds Bur-

nell's testimony, on this point, to be unpersuasive.

Burnell signed the General Indemnity Agreement which backed not only the Bates bonds but all future bonds. The Novation Agreement was signed by the same parties as the Bates bonds, with one addition—the replacement surety Vigilant. By virtue of the General Indemnity Agreement, Burnell was not a necessary signatory on the original bonds, and he was not a necessary signatory to the Novation Agreement. Vigilant assumed liability under the terms of the Bates bonds, and performed its suretyship obligations.

Accordingly, it is hereby *ORDERED* that judgment shall enter against Walter E. Burnell and WEB Electric, Inc. jointly and severally, in the amount of One Hundred Fifty–Six Thousand Dollars ($156,000.00) and against Walter E. Burnell for Vigilant's attorneys' fees accrued in connection with the collection action since May 28, 1994. Counsel shall confer within ten (10) days of this Decision and Order and make a good-faith effort to agree upon the amount of reimbursable attorneys' fees to be awarded to Plaintiff. If agreement is reached, a proposed order setting forth the award shall be filed *forthwith* for the Court's consideration. If agreement is not reached, Plaintiff shall file a formal application for fees within twenty (20) days of this Decision and Order to which Defendant Burnell shall respond in accordance with Local Rule 19.

---

7. Burnell claims that it is equally likely that personal financial statements are used to review the continued overall financial structure of a closely held business for purposes of bonding that business. Defendant's Post–Trial Reply Brief (Docket No. 32) at 3. The Court is not persuaded by this argument. If Burnell had no longer intended to be personally liable under the bonds, the Court finds that he would have at least attempted to change his course of conduct with respect to routinely submitting his personal financial records.